# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ANNA M. SALYERS O/B/O H.M.C.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:11CV00030 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff. Eric P. Kressman, Regional Chief Counsel, Region III, Patricia A. Stewart, Assistant Regional Counsel, Maija DiDomenico, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the decision of the Commissioner.

I

Anna M. Salyers brings this claim on behalf of her daughter, minor child H.M.C. Salyers challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying her claim for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C.A. §§ 1381-1383f (West 2012). Jurisdiction of this court exists under 42 U.S.C.A. §§ 1383(c)(3).

Salyers sought benefits for H.M.C. on November 1, 2007, alleging disability as of November 1, 2007. The claim was denied initially and upon reconsideration. An administrative hearing was held before an administrative law judge ("ALJ") on May 17, 2010, at which Salyers appeared and testified on behalf of H.M.C. On June 11, 2010, the ALJ issued a decision concluding that H.M.C. was not disabled. The Social Security Administration's Appeals Council denied Salyers' request for review. Salyers then filed a complaint before this court seeking judicial review of the ALJ's decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

H.M.C. was born on September 30, 2004, making her a preschool age child under the regulations. *See* 20 C.F.R. § 416.926a(h)(2)(iii) (2011).

H.M.C. was admitted to Johnson City Medical Center on December 30, 2005, after she had a complex febrile seizure. She was discharged two days later after a normal physical examination and told to follow up with her primary care physician.

On December 11, 2006, Salyers reported to H.M.C.'s primary care physician, Parmod K. Sapra, M.D., that two days earlier H.M.C. had been

unresponsive, had shaking legs, and that her lips had lost color. Dr. Sapra opined that this episode had been a possible seizure.

On May 22, 2007, Salyers brought H.M.C. to Norton Community Hospital because she had been overly sleepy at home. Dr. Sapra observed that there was no definite evidence that H.M.C. had had a seizure at this time but she had experienced a febrile seizure in the past and was not on any regular anti-seizure medication. H.M.C. stayed overnight at the hospital and was discharged the next day. On May 31, 2007, Salyers told Dr. Sapra that H.M.C. had intermittent staring spells. Dr. Sapra questioned whether these episodes could be absence seizures.

On July 15, 2007, H.M.C. sought treatment at Norton Community Hospital for treatment of seizures. Salyers stated that H.M.C. has "blank stare seizures" and thought that H.M.C. might have been having seizures that day because she was lethargic and bluish around her lips. Dr. Sapra recommended that H.M.C. be admitted to Johnson City Medical Center but Salyers declined and requested discharge.

On August 1, 2007, H.M.C. was seen by Mark Quigg, M.D., of the University of Virginia neurology clinic, for a consultation. The doctor noted that since her first febrile seizure, H.M.C. had had approximately 5 to 6 spells consisting of staring straight off, perioral cyanosis, and occasional shaking of her legs. No neurological abnormalities were observed on examination but H.M.C.'s

head circumference was noted to be small for her age. Dr. Quigg ordered further testing and prescribed anti-convulsant medication.

H.M.C. underwent an EEG on September 21, 2007, which was normal. She underwent an MRI on November 16, 2007, which showed a left mesial temporal sclerosis.

H.M.C. was seen by Nathan Fountain, M.D., and Gabriel U. Martz, M.D., at the University of Virginia on October 30, 2007. The doctors noted that she was developmentally normal and had had one seizure in two months since beginning treatment with anti-convulsant medication. H.M.C. was diagnosed with probable symptomatic localization related epilepsy secondary to left mesial temporal sclerosis with complex partial seizures under poor control. Dr. Martz increased H.M.C.'s anti-convulsant medication to better control her seizures.

On January 9, 2008, H.M.C. was examined by Dr. Quigg, who noted that her epilepsy was well-controlled with medication. H.M.C. had been seizure-free since August 2007.

H.M.C.'s file was reviewed by a state agency physician, Joseph Duckwall, M.D., in January 2008. Dr. Duckwall opined that H.M.C.'s seizure disorder was a severe medical impairment but did not meet, medically equal, or functionally equal a listed impairment.

H.M.C. presented to Norton Community Hospital on May 10, 2008, after Salyers observed that H.M.C. was extremely tired, a sign that she had had a seizure.

On September 11, 2008, Richard Surrusco, M.D., a state agency physician, reviewed the medical evidence of record and concluded that H.M.C.'s seizure disorder was severe but did not meet, medically equal, or functionally equal a listed impairment.

On November 13, 2008, Dr. Quigg completed a form opining that H.M.C.'s condition met or medically equaled a listing in Section 111.00 in that she has "complex partial seizures." (R. at 369.) He noted that he was not aware of H.M.C.'s current level of condition but as of April 2008,[1] she had not had a seizure since August 2007.

On January 30, 2009, H.M.C.'s father brought her to the Norton Community Hospital emergency room and reported that she had had two seizures.

On June 11, 2009, H.M.C. presented to the Wise Field Clinic with her father. Dr. Fountain noted that H.M.C. had been seizure-free with her medication until Salyers stopped giving H.M.C. the medication in January of 2009. H.M.C.'s father realized that Salyers was not giving H.M.C. her medications when he obtained custody of her and she had three seizures in one day. The anti-seizure medication

---

[1] Dr. Quigg's note that he last saw H.M.C. in April 2008 may have been an error since other records indicate that the prior visit was actually in January 2008.

was re-started in May 2009, and since that time H.M.C. had not had another seizure. H.M.C.'s father reported that Salyers did not believe that H.M.C. needed the anti-seizure medication.

On April 9, 2010, H.M.C. had tonic clonic seizure-like activity for one minute. Her father called an ambulance and she was taken to the hospital. She had a similar seizure in the emergency room. H.M.C.'s father stated he was unsure whether H.M.C. was taking her anti-convulsant medication regularly due to a joint custody arrangement with Salyers.

At the administrative hearing, Salyers testified that H.M.C. had her first seizure when she was 15 months old. Salyers stated that H.M.C. has one grand mal seizure every two to three months and it takes H.M.C. about 24 hours to return to normal after a seizure. Salyers stated that H.M.C. is in kindergarten and has had some behavioral problems, but Salyers is not sure whether these problems are related to the seizure disorder.

In his decision, the ALJ found that H.M.C.'s seizure disordered constituted a severe impairment in that it caused more than minimal functional limitations but concluded that it did not meet, medically equal, or functionally equal a listed impairment. The ALJ thus concluded that H.M.C. was not disabled.

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  A child is considered disabled for SSI purposes only if the child suffers from a "medically determinable physical or mental impairment which results in marked and severe functional limitations" and which lasts for a period of not less than 12 months.  42 U.S.C.A. § 1382c(a)(3)(C)(i).

The regulations require a three-step sequential evaluation process, under which the Commissioner considers:  (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets or medically equals the severity of an impairment in the listings.  20 C.F.R. § 416.924 (2011).  If the child's impairment does not meet or medically equal a listing, then the ALJ will consider whether the impairment functionally equals a listed impairment.  *Id.* at § 416.924(a).

To determine whether a child's impairment functionally equals a listed impairment, the Commissioner evaluates the following six functional domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. §

416.926a(b)(1) (2011). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in marked limitations in two domains of functioning or an extreme limitation in one domain.[2] 20 C.F.R. § 416.926a(a) (2011).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

---

[2] A "marked" limitation is "more than moderate" but "less than extreme," and may arise when one or several activities or functions are limited. 20 C.F.R. § 416.926a(e)(2) (2011). An "extreme" limitation exists when the child's impairment or combination of impairments impose(s) very serious restrictions on his/her ability to initiate, sustain, or complete activities independently. 20 C.F.R. § 416.926a(e)(3) (2011).

Salyers argues that substantial evidence does not support the ALJ's decision that H.M.C.'s impairment does not meet or medically equal a listing requirement. Specifically, she argues that the ALJ should not have relied upon the opinions of the state agency physicians that H.M.C. did not meet or medically equal a listing requirement because those were rendered without the consideration of Dr. Quigg's opinion that H.M.C.'s impairment met the requirements outlined in 20 C.F.R. pt. 404, subpt. P, app. 1 at §11.00 (2011).

Presumably, Salyers' argument is that had the state agency physicians reviewed Dr. Quigg's opinion, they would have concluded that H.M.C.'s impairment did meet the requirements of § 11.00. Salyers, however, does not explain why this is so. This is problematic because § 11.00 does not, itself, contain actual listing requirements for specific impairments. Rather, it is the introductory paragraph to the multiple possible neurological listed impairments. Thus, on the face of it, Dr. Quigg's opinion does not conclusively show that H.M.C. meets or medically equals a listed requirement.

Further, the evidence contradicts Dr. Quigg's conclusion that H.M.C.'s condition meets or medically equals an actual listed requirement. The listed neurologic impairments include two possibly relevant disorders: § 11.02 Epilepsy-convulsive epilepsy; and § 11.03 Epilepsy-nonconvulsive epilepsy. 20 C.F.R. pt. 404, subpt. P, app. 1 at §§ 11.02-.03. The listing for § 11.02 states that the seizure

pattern must occur "more frequently than once a month in spite of at least [three] months of prescribed treatment." *Id.* at § 11.02. The listing for 11.03 states that the typical seizure pattern must occur "more frequently than once weekly in spite of at least [three] months of prescribed treatment." *Id.* at § 11.03. Dr. Quigg's own opinion states that H.M.C. had not had a seizure from August 2007 to January or April 2008. The overall evidence indicates that when H.M.C. follows her prescribed medication regime, she does not have seizures at all.[3] The state agency physicians relied on the overall evidence in the record when reaching their conclusions and, given the patent difficulties with Dr. Quigg's opinion, there is no indication that had they reviewed it, their conclusions would be any different. The ALJ properly accorded their opinions significant weight and properly accorded Dr. Quigg's opinion little weight. Substantial evidence supports the ALJ's decision.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

---

[3] Salyers testified that H.M.C. had one seizure every two to three months. However, this testimony is contradicted by the evidence showing that H.M.C. only had seizures when Salyers decided to stop administering the prescribed anti-epileptic medication.

-11-

          DATED:   April 13, 2012

          /s/  James P. Jones
          United States District Judge